**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LUIS G. ZAYAS CINTRON,** | : | |
| **Petitioner,** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **No. 18-5537** |
| **SUPERINTENDENT JAMEY** | : | |
| **LUTHER, et al.,** | : | |
| **Respondents.** | : | |

**MCHUGH, J.**                                                    **December 15, 2022**

**MEMORANDUM**

      Luis Zayas Cintron ("Cintron") brings this habeas corpus petition pursuant to 28 U.S.C § 2254 challenging his conviction in the Court of Common Pleas for Chester County for attempted murder and related offenses. *Commonwealth v. Cintron*, CP-15-CR-0001712-2010. For the reasons that follow, I am constrained to deny his petition.

## I.   Procedural History

      On June 23, 2011, a jury sitting before Judge William P. Mahon in the Court of Common Pleas of Chester County found Cintron guilty of attempted murder, two counts of aggravated assault, two counts of simple assault, recklessly endangering another person, terroristic threats, and two counts of possession of an instrument of crime, all in relation to Cintron shooting his landlord on April 6, 2010. During the three-day trial, Cintron was represented by Erin Book from the Chester County Public Defender's Office. On September 7, 2011, Judge Mahon sentenced Cintron to an aggregate sentence of at least twenty-three years and four months, with a maximum sentence of fifty years.

      On September 16, 2011, Mr. Cintron filed a post-sentence motion for relief, which Judge Mahon denied on September 19, 2011. The same day that Judge Mahon denied the motion,

Cintron filed a direct appeal to the Superior Court.  Represented by his trial counsel, Attorney Book, Cintron argued on appeal that the evidence was insufficient to support the verdict, and that Judge Mahon erred in denying a motion to suppress and in overruling a motion to exclude certain testimony.  *Commonwealth v. Cintron*, No. 2505 EDA 2011, 2013 WL 11266908 (Pa. Super. Ct. Apr. 5, 2013).  The Superior Court affirmed Cintron's conviction and sentence on April 5, 2013, concluding that the issues Cintron raised lacked merit.  *Id.* at *8.  Cintron filed a Petition for Allowance of Appeal before the Pennsylvania Supreme Court on May 3, 2013, which the Supreme Court denied on September 5, 2013.  *Commonwealth v. Cintron*, 74 A.3d 125 (Pa. 2013).

On March 26, 2014, Mr. Cintron filed a *pro se* petition under the Pennsylvania Post-Conviction Relief Act ("PCRA") in the Chester County Court of Common Pleas.  Judge Mahon appointed Robert P. Brendza to represent him, as Cintron had a right to counsel for his first PCRA petition under state law.  A conflict subsequently arose between Brendza and Cintron, in part because Brendza allegedly would not agree to show Cintron any amended PCRA petition before filing.  Pet.'s Mem., ECF 4, at 3.  On August 29, 2014, Brendza petitioned the Court for leave to withdraw as PCRA counsel and filed a letter explaining that the arguments raised in Cintron's petition were meritless, as required by *Commonwealth v. Turner*, 544 A.2d 927, 928 (Pa. 1988).  Frustrated that Brendza did not advance his preferred arguments, Cintron filed a Motion for Removal of Court-Appointed Counsel on September 16, 2014.  Judge Mahon denied the motion on the same day.  On October 1, Cintron filed a response to Brendza's August 29 letter to Judge Mahon, emphasizing the merits of the issues that he asked Brendza to raise.  Judge Mahon, however, dismissed the response as an improper *ex parte* communication because Brendza remained Cintron's counsel.  *Commonwealth v. Cintron*, No. 3189 EDA 2014, 2015 WL 6160166, at *1 (Pa. Super. Ct. Oct. 13, 2015).

At the same time, Judge Mahon notified the parties that he intended to dismiss the PCRA petition without a hearing and would likely grant Brendza's petition to withdraw. *Id*. at *1-2. Cintron responded to the notice with *pro se* objections, but Judge Mahon dismissed the PCRA petition and allowed Brendza to withdraw on October 24, 2014. Cintron timely filed a *pro se* appeal to the Superior Court, which vacated the order dismissing Cintron's petition and remanded for appointment of new counsel in light of Brendza's performance. *Id.* at *5. The Superior Court further ordered Cintron's new counsel to, at the very least, address Cintron's claim that trial counsel was ineffective in failing to impeach his landlord's credibility as a witness with his allegedly inconsistent preliminary hearing testimony. *See id.* at *4.

Judge Mahon appointed Alexander Silow as Cintron's new PCRA counsel on October 14, 2015. Silow petitioned to withdraw from representing Cintron in April 2016, which Cintron attributes to Silow's unwillingness to pursue ineffectiveness allegations against Attorney Book, because Silow had a professional relationship with the public defender's office. Pet.'s Mem., ECF 4, at 6. After Silow filed his petition, Judge Mahon again notified the parties that he intended to dismiss the PCRA petition on May 26, 2016, and Cintron filed *pro se* objections in response. After Judge Mahon ordered Silow to evaluate Cintron's claims more thoroughly but Silow failed to do so, Judge Mahon relieved Silow as counsel on January 30, 2017.

On February 2, 2017, Judge Mahon next appointed C. Curtis Norcini as Cintron's third PCRA counsel. According to Cintron, Cintron "fully apprised" Norcini of the various arguments he wished to advance in his PCRA proceedings, and Norcini "repeatedly reassured him" that he would not file anything with the court before conferring with Cintron. Pet.'s Memo, ECF 4 at 8. On June 26, 2017, Norcini filed an amended PCRA petition raising one issue for review, which involved Cintron's claim that Attorney Book was ineffective in failing to impeach Cintron's

landlord's credibility as a witness with his allegedly inconsistent preliminary hearing testimony regarding the composition of the table in Cintron's apartment kitchen.  Pet.'s Memo, ECF 4 at 8 n.6.

Cintron claims that he was "absolutely stunned" to find out about the amended petition, as Norcini never notified him before filing the petition and the document failed to address Cintron's other ineffective assistance claims.  *Id.* at 9.  On August 9, 2017, Cintron filed a *pro se* motion for replacement of Norcini as his PCRA counsel, and for leave to file a second amended PCRA petition.  Cintron's motion highlighted that his PCRA petition needed to address *all* the ineffective assistance claims he wanted to pursue to ensure that these claims were preserved for federal habeas review.  Ex. B to Pet.'s Memo, ECF 4, at ¶ 10.  On August 11, 2017, Judge Mahon denied Cintron's request for new counsel and ordered Norcini to review the issues raised in Cintron's motion and either file a second amended PCRA petition incorporating the additional issues or a letter explaining why Cintron's arguments were meritless.  Pet.'s Mem., ECF 4, at 10-11.  On September 11, 2017, Norcini filed a "no-merit" letter regarding the remainder of the Cintron's arguments. *See* Pet.'s Mem. Ex. F, ECF 4 at 144-52.

On October 11, 2017, Judge Mahon filed a third notification that he intended to dismiss Cintron's PCRA petition.[1]  On October 30, 2017, Cintron filed *pro se* objections to the Judge's notice, which again included extensive discussion of the ineffective assistance claims that Norcini omitted,  and reiterated Cintron's desire to properly exhaust his remedies in state court in case he had to resort to federal habeas relief.  *See* Ex. K to Pet.'s Memo, ECF 4.  On November 9, 2017, Cintron filed a *pro se* "Motion for Removal of Court-Appointed Counsel and Leave to Proceed

---

[1] The Notice of Intent to Dismiss PCRA Petition ("PCRA Notice"), contained in the state court record received by the Court, is also appended to the Superior Court's PCRA opinion on Westlaw.  *See Commonwealth v. Cintron*, No. 552 EDA 2018, 2018 WL 6190381 (Pa. Super. Ct. Nov. 28, 2018).

Pro Se on Appeal to the Superior Court from Denial of PCRA Relief" due to his frustration with Norcini's representation and his desire to pursue all of his claims.  *See* Ex. L to Pet.'s Memo, ECF 4.

Judge Mahon held a hearing on January 2, 2018, pursuant to *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998), to discuss the implications of Cintron proceeding *pro se*.[2]  At the hearing, Cintron stated his desire to raise all his claims but conceded that he was incapable of representing himself due to his difficulties with English and lack of familiarity with the law.  Because Cintron required the assistance of counsel to proceed, Judge Mahon dismissed the outstanding *pro se* motions as moot.  Judge Mahon denied Cintron's PCRA petition on January 5, 2018.

On February 2, 2018, Norcini timely appealed the denial of the petition to the Superior Court.  In the appeal, Norcini raised one issue: whether Judge Mahon erred in denying an evidentiary hearing regarding the claim that Attorney Book was ineffective in failing to impeach Cintron's landlord's credibility as a witness with his allegedly inconsistent preliminary hearing testimony.  *See* Ex. M to Pet.'s Memo, ECF 4 at 228-30.  The Superior Court affirmed Judge Mahon's denial on November 28, 2018, holding that the issue was meritless.  *Commonwealth v. Cintron*, No. 552 EDA 2018, 2018 WL 6190381, at *3 (Pa. Super. Ct. Nov. 28, 2018).  Cintron did not seek review in the Pennsylvania Supreme Court.

---

[2] The transcript from the *Grazier* hearing is not in the state court record received by the Court, but because there does not appear to be a dispute over the basic facts of the proceeding, I rely on Mr. Cintron's representations in his memo supporting his habeas petition.  *See* ECF 4 at 14-15.

On December 6, 2018, Petitioner timely[3] submitted to this Court a *pro se* Petition for Writ

of Habeas Corpus pursuant to 28 U.S.C. § 2254, which was docketed on December 14, 2018.  *See*

ECF No. 1.  The Petition identifies the following claims for relief:

> GROUND ONE: Trial counsel rendered constitutionally ineffective assistance of counsel by failing to impeach the alleged victim, the main Commonwealth witness against Petitioner, with clearly false testimony given at the preliminary hearing. Pet. at 8, 8(a)-1, ECF No. 1 at 19, 20.

> GROUND TWO: Trial counsel rendered constitutionally ineffective assistance by failing to properly investigate and call a critical witness, Dr. Diaz, who would have testified that the victim, contrary to his trial testimony that the shooting was part of a bizarre murder-for-hire plot, told him that the shooting actually grew out of a dispute over rent.  Pet. at 10, 10(a)-1, ECF No. 1 at 26, 27.

> GROUND THREE: Trial counsel rendered constitutionally ineffective assistance by failing to object and motion to strike improper remarks during the opening statement and closing argument by the prosecutor falsely claiming that Petitioner verbally expressed an intent to kill Mr. Idrovo after pointing his gun at him and just before pulling the trigger when even the complainant himself, the individual who was shot, denied that Petitioner said any such thing at the time.  Pet. at 12, 12(a)-1, ECF No. 1 at 37, 38.

> GROUND FOUR: The cumulative prejudice from the errors and trial counsel's ineffectiveness discussed above in Habeas Claims One to Three above deprived Petitioner of his right to the effective assistance of counsel under *Strickland v. Washington* and a fundamentally fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.  Pet. at 13, 13(a)-1, ECF No. 1 at 43, 44.

Mr. Cintron's petition was then referred to several federal magistrate judges for a report

and recommendation ("R & R"), but an unfortunate combination of events prevented completion

---

[3] Under 28 U.S.C. § 2244(d)(1), a habeas petition for relief from state custody must be filed within one year of the date when the judgment became final. Cintron's conviction became final on December 4, 2013, when the time for seeking review in the United States Supreme Court expired in his direct appeal. *See Kapral v. United States*, 166 F.2d 565, 577 (3d Cir. 1999) (judgment is final when time for seeking appeal expires if such appeal is not sought); S. Ct. Rule 13(1) (allowing 90 days to file a petition for certiorari).  Cintron filed a timely PCRA petition on March 26, 2014, tolling the habeas limitations period.  *See* 28 U.S.C. § 2244(d)(2).  After the Superior Court affirmed the denial of Cintron's PCRA petition on November 28, 2018, Cintron filed his federal habeas petition within a month.  This is well within the one-year time limit.

of an R & R.[4]  To bring this matter to a resolution, I vacated the referral to address the merits

directly.

## II.    Legal Standards

### a.   Exhaustion and procedural default

Before a federal court reaches the merits of a habeas claim, a petitioner must comply with

the exhaustion requirement of 28 U.S.C. § 2254(b), which mandates that a petitioner "give the

state courts one full opportunity to resolve any constitutional issues by invoking one complete

round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838,

845 (1999).  Exhaustion requires the petitioner to present to the state courts the same factual and

legal theory supporting the claim.  *Landano v. Rafferty*, 897 F.2d 661, 669 (3d Cir. 1990).  It also

requires the petitioner to preserve each claim at the state appellate level. *See Holloway v. Horn*,

355 F.3d 707, 714 (3d Cir. 2004) (finding exhaustion satisfied only if a claim was fairly presented

at each level of the state court system) (citing *O'Sullivan*, 526 U.S. at 844-45).  A habeas petitioner

bears the burden of proving exhaustion.  *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).

Failure to exhaust a claim in state court may be excused in limited circumstances on the

ground that exhaustion would be futile.  *Id.* at 518-19.  Where the petitioner fails to properly

exhaust claims in state court, and the claims can no longer be raised in state proceedings because

of a failure to follow the prescribed state procedure for presenting such issues, the claims are

functionally considered exhausted, and are subject to the doctrine of procedural default.  *See*

---

[4] An R & R was previously filed in this case by Judge Perkin, ECF 5, recommending that I stay Mr. Cintron's claims.  In the absence of objections, I initially adopted Judge Perkin's R & R.  I vacated that order and referred the case back to Judge Perkin after Cintron filed delayed objections to the R & R that clarified the procedural posture of the case.  The Chester County District Attorney then addressed the merits. The case was then transferred to two other magistrate judges.   Because of delays created by the Covid-19 pandemic, several retirements, and the untimely death of Magistrate Marilyn Heffley, an R & R was never completed.

*Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).  For procedural default to apply, "state law must clearly foreclose review of unexhausted claims." *Toulson v. Beyer*, 987 F.2d 984, 987 (3d Cir. 1993); *see also Lines v. Larkins*, 208 F.3d 153, 163-64 (3d Cir. 2000).

Federal courts may not review procedurally defaulted claims unless the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law" underlying the claim, or otherwise demonstrates that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

**b.  Excusing default under *Martinez* and *Strickland***

Ineffective assistance of state post-conviction relief counsel generally does not constitute "cause" to overcome procedural default of a claim. *Coleman*, 501 U.S. at 753-54.  Under *Martinez v. Ryan*, however, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. 1, 9 (2012).  This is because "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim." *Id.* at 10.  This limited exception therefore allows a petitioner to overcome default if they establish that: 1) a procedurally defaulted ineffective assistance of trial counsel claim is "substantial," meaning it has "some merit"; and that 2) "state post-conviction counsel was 'ineffective under the standards of *Strickland v. Washington.*'" *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019).

Establishing an ineffective assistance claim under *Strickland* requires a showing that counsel's representation fell below an "objective standard of reasonableness"—the performance prong—as well as a reasonable probability that the result of the proceeding would have been different but for counsel's errors—the "prejudice" prong.  466 U.S. 668, 687-88, 694 (1984).  In the context of *Martinez*, a petitioner who establishes deficient performance by post-conviction counsel can satisfy the *Strickland* prejudice prong "with a substantial claim of ineffective

assistance of trial counsel that would otherwise have been deemed defaulted." *See Workman*, 915 F.3d at 939, 941 (citations omitted).  Thus, the *Coleman* and *Strickland* standards collapse into each other, and a petitioner seeking to overcome procedural default under *Martinez* must simply show that (1) the defaulted ineffective assistance claim is "substantial" and (2) post-conviction counsel's performance fell below an objective standard of reasonableness.  *See id.* at 941.

While the *Martinez* exception remains good law, its scope was limited by the Supreme Court's recent decision in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022).  In *Shinn*, the Supreme Court held that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record," even where the insufficient state court record results from the ineffective assistance provided by a petitioner's state post-conviction counsel.  *Id.* at 1734.  To the extent that an evidentiary hearing or introduction of new evidence was previously permitted to assess cause and prejudice when conducting a *Martinez* analysis, such actions by a federal habeas court appear to be impermissible under *Shinn.*  However, the holding in *Shinn* does not fully foreclose federal habeas review of defaulted ineffective assistance claims under *Martinez* where there is sufficient evidence already in the state court record to review such claims.

### c.   Merits review of federal habeas claims

Under federal habeas law, review of a state court conviction is limited in nature and may only be granted if (1) the state court's adjudication of a claim asserted in the habeas petition "resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Factual issues determined by a state court are presumed to be correct but may be rebutted by clear and convincing evidence to the contrary.  *Werts*, 228 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).

Under the "contrary to" clause, a federal habeas court can grant the writ of habeas corpus "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court can grant the writ if the state court uses the proper legal principle from federal law but applies that principle to the facts of the case in a manner that is objectively unreasonable. *Id*. at 409-13. Significant deference is owed to state court adjudication of an issue by the federal habeas court, but "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003).

### III.    Discussion

Cintron's claim listed as Ground One is fully exhausted, and therefore is subject to the deference owed to previous state court adjudication under 28 U.S.C. § 2254(d). Because the state courts' conclusion that this claim was meritless is not contrary to or an unreasonable application of federal law and does not rest upon an unreasonable determination of the facts, this claim fails.

Cintron's claims listed in Grounds Two, Three, and Four are procedurally defaulted.[5] Even if Cintron can prove that there is a substantial ineffective assistance claim underlying each, he does not prove that Attorney Norcini was deficient in failing to raise such claims during state PCRA proceedings. I will therefore decline relief and see no basis on which to issue a certificate of appeal.

---

[5] The Commonwealth focuses almost exclusively on whether the underlying claims are "substantial." My analysis addresses both the lack of substantiality, and whether the decisions of post-conviction counsel not to advance these claims can be deemed deficient, as claimed by Mr. Cintron.

### a. Factual Background

Consideration of Cintron's claims requires an overview of the evidence presented at trial. I begin by reproducing Judge Mahon's review of the evidence at trial as set forth in his Notice of Intent to Dismiss from October 11, 2017, which was affirmatively cited to by the Superior Court in reviewing the dismissal of Cintron's PCRA petition. *See Commonwealth v. Cintron*, No. 552 EDA 2018, 2018 WL 6190381 (Pa. Super. Ct. Nov. 28, 2018). I will discuss specific evidence and testimony further as necessary to address the claims.

On April 6, 2010, at approximately 2:20pm, the victim, Francisco Idrovo, arrived home from work to his residence as usual. (N.T., 6/21/11, at 72.) Mr. Idrovo, a man of Hispanic descent, had lived in the United States for nearly 19 years and had worked as a garbage truck driver for 18 of those years. (N.T., 6/21/11, at 60-71.) Mr. Idrovo had at one time been married to a woman named Gloria Morena and the two had lived in matrimony from 1998 until their divorce in 2004. (N.T., 6/21/11, at 80-81.) In 2010, despite being divorced for nearly six years, Mr. Idrovo and his ex-wife still shared a complicated, though not uncommon, relationship that is best described as on-again-off-again. (N.T., 6/21/11, at 80-81.) At this time, Mr. Idrovo resided at 1127 Manor Road (Route 82), Coatesville, Chester County, Pennsylvania. (N.T., 6/21/11, at 72.)

In his eighteen years in the United States, Mr. Idrovo had done well for himself: his residence included a single-family home located atop of a driveway, a fenced-in pool area located at the bottom of the driveway, and a detached garage above which was an apartment, located to the right of the single family home. In that apartment lived Defendant, a retired boxer who now coached young boxers, and his wife, Luz Vargas. (N.T., 6/21/11, at 68-69.) Defendant had rented the apartment from Mr. Idrovo and his ex-wife upon Ms. Moreno introducing the Defendant to her husband and negotiating a lease agreement. (N.T., 6/21/11, at 67-72, N.T., 6/23/11, at 40.)

Upon arriving home from work that ill-fated day, Mr. Idrovo entered his home briefly and then, intending to cut his grass, proceeded to his garage to take out his lawnmower. (N.T. 6/21/11, at 73.) As he brought the lawnmower outside, he was approached by Defendant, who said he needed to speak with Mr. Idrovo. (N.T. 6/21/11, at 73.) Obligingly, Mr. Idrovo followed Defendant to Defendant's apartment, whereupon entering, Defendant locked the door to the apartment behind them. (N.T. 6/21/11, at 73.) As Mr. Idrovo took a seat at the kitchen table, Defendant pulled out a gun. (N.T. 6/21/11, at 73-75.) Defendant ordered Mr. Idrovo to place his hands on top of the table and told him not to move. (N.T. 6/21/11, at 73, 77.) He then informed Mr. Idrovo that it was he who had burglarized his home a few weeks prior and that he had been hried by Mr. Idrovo's ex-wife and her boyfriend to kill him for $5,000.00. (N.T. 6/21/11, at 73, 77-79.) The

Defendant told Mr. Idrovo that he had a recorded message from the boyfriend of Mr. Idrovo's ex-wife that Mr. Idrovo would listen to. (N.T. 6/21/11, at 73.) The Defendant then proceeded to place a call and a Spanish-speaking woman answered the phone, stating that "they would get there in five minutes." (N.T. 6/21/11, at 73, 78.) Upon hearing this, Mr. Idrovo fled the apartment and proceeded down the driveway toward the pool area and Manor Road (Route 82). (N.T. 6/21/11, at 73.) However, Defendant caught up to Mr. Idrovo, and after telling him not to move, shot Mr. Idrovo in the abdomen. (N.T. 6/21/11, at 73, 81-82.) Defendant then fled up the driveway in the direction of the apartment. (N.T. 6/21/11, at 82.) Badly injured, Mr. Idrovo proceeded to a neighbor's lawn at 1123 Manor Road. (N.T. 6/21/11, at 82.)

Joe Stern, a neighbor of Mr. Idrovo who resides at 1121 Manor Road, was at home watching a television program on that same afternoon, when he suddenly heard a popping noise. (N.T. 6/21/11, at 37.) Believing the sound to be that of a gunshot, Mr. Stern went to his window to try to determine what had happened. (N.T. 6/21/11, at at 37-38.). Outside, he saw Mr. Idrovo standing in the lawn of the 1123 Manor Road residence with his arms raised. (N.T. 6/21/11, at 38.) Mr. Stern immediately discerned that Mr. Idrovo had been shot and upon emerging from his home, made eye contact with Defendant who was now standing at the pool fence. (N.T. 6/21/11, at 38.) Mr. Stern then observed Defendant immediately flee the area. (N.T. 6/21/11, at 38.) With the shooter out of sight, Mr. Stern went to Mr. Idrovo's aide while placing a call to 911. (N.T. 6/21/11, at 40.) Mr. Stern picked up Mr. Idrovo, who appeared to be bleeding from his arm and stomach, and carried Mr. Idrovo to his own property where he hid the injured victim behind a rock, in case the Defendant returned. (N.T. 6/21/11, at 41.)

On that same day, off-duty officer Christopher Jason, a police officer with East Coventry Township, was enjoying the afternoon with his young daughter outside their residence on Hurley Road, located in West Brandywine Township, Chester County, Pennsylvania. (N.T. 6/22/11, at 32-33.) Hurley Road is approximately a half mile from Manor Road (Route 82). (N.T. 6/22/11, at 32.) Officer Jason had just entered his residence with his daughter when he heard emergency vehicle and police car sirens resounding in the area. (N.T. 6/22/11, at 33.) Alerted by the many sirens, Officer Jason surmised that an accident had most likely occurred close by. Officer Jason stepped out of his house to confirm his suspicions and observed numerous police cars driving by his house. (N.T. 6/22/11, at 33.) Judging by the high volume of police activity and from his own experience as an officer, Officer Jason concluded that there was likely a high priority emergency taking place. (N.T. 6/22/11, at 34.) Officer Jason proceeded to call a close friend, Arthur Brown, from the Chester County Sheriff's Department to inquire into the situation. (N.T. 6/22/11, at 33.) He was informed that a shooting had occurred on Route 82, fairly close to his own residence. (N.T. 6/22/11, at 33.)

Officer Jason exited his home again and while standing outside, suddenly saw a man running through his yard. (N.T. 6/22/11, at 35.) Officer Jason called out to

the man to ask him what he was doing on his property. (N.T. 6/22/11, at 37.) The man, later identified as Defendant, pointed to his shirt and stated that he was "just training, training for Golden Gloves." (N.T. 6/22/11, at 37, N.T. 6/23/11, at 80.) Suspicious, Officer Jason re-entered his home and contacted the Chester County Radio room to inquire as to whether they were looking for a subject involved in a shooting and to alert them of the suspicious man. (N.T. 6/22/11, at 38-39.) Shortly thereafter, police units began to arrive near Officer Jason's residence. (N.T. 6/22/11, at 39.) A search of the surrounding area ensued and Defendant was eventually found hiding in an abandoned barn. (N.T. 6/22/11, at 40.) Defendant was apprehended and transported to the West Brandywine Police Department, where upon being properly *Mirandized*,[6] the Defendant admitted to shooting the victim, but claimed he did so in self-defense.[7] (*Id.* at 74, 171-72; N.T. 6/23/11, at 69.)

PCRA Notice at 4-5.

> **b. Ground One was addressed by the state courts, and there is no basis to disturb the state courts' adjudication of the issue.**

Mr. Cintron's first claim asserts that his trial counsel, Attorney Book, provided constitutionally ineffective assistance of counsel by failing to impeach Mr. Idrovo with allegedly false testimony given at the preliminary hearing about the composition of a table in Cintron's apartment. Pet., ECF No. 1, at 19-20. As noted above, this claim was presented to the trial court and Superior Court during Cintron's PCRA proceedings, both of which rejected the claim. The Commonwealth argues that the state courts' adjudication of this issue should not be disturbed because it was not contrary to nor unreasonably applied federal law, and did not involve an unreasonable determination of the facts.

---

[6] Cintron was not provided with an interpreter during this interrogation, even though the state trooper who arrested him noted that he spoke "broken English" and Cintron told the officers interrogating him that he did not speak English well. N.T. 6/22/11 at 74; N.T. 6/23/11 at 82-83.

[7] Cintron claims that he shot Idrovo in self-defense after Idrovo attempted to assault him with a baseball bat. N.T. 6/22/11 at 172; N.T. 6/23/11 at 76-79. At trial, Cintron testified that *Idrovo* had asked him to shoot *Moreno* (rather than vice-versa), and that Idrovo was enraged that Cintron refused to do so and might tell Moreno about the request. N.T. 6/23/11 at 74-79. While Judge Mahon did not include this context in his factual summary, I include it here because it is relevant to Cintron's claim that the jury would have believed Cintron's testimony over Idrovo's if Attorney Book had successfully impeached Idrovo on several occasions.

During the preliminary hearing, Idrovo testified that Cintron invited him into Cintron's apartment and had Idrovo sit down at a table.  N.T., 5/7/10, at 6-7.  Idrovo testified that when he did so, Cintron sat down across from him, drew a gun from his pants, and pointed the gun at him. *Id*.  On cross-examination at that hearing, Idrovo testified as follows:

> Q:      So did you sit at a dining room table?
> A:      Yes.
>
> Q:      And [Cintron] asked you to have a seat?
> A:      Yes.
>
> Q:      And you did?
> A:      Yes.
>
> Q:      And he took a seat across from you?
> A:      Yes.
>
> Q:      What height was the dining room table?
> A:      Almost as high as this (indicating).
>
> Q:      So if you were sitting in a chair at the dining room table, would it be fair to say it comes up above maybe where your rib cage is?
> A:      Yeah, almost.
>
> Q:      So you're sitting and the defendant is sitting and he tells you put your hands on the table?
> A:      Yes. And then right away he got out the gun.
>
> Q:      You say he got out the gun?
> A:      Yes.
>
> Q:      Did he pull it out of his pocket?
> A:      From here (indicating).
>
> Q:      I'm sorry, I can't see.  So you're saying he pulled [the gun] out of his waist band?
> A:      He had it in his waist, under his trousers.
>
> Q:      So he pulled it out of his waistband?
> A:      Yes.

> Q:     And you were able to see that, even though he was sitting across the table
>        from you?
> A:     It was a glass table.

N.T., 5/7/2010, at 19.

At trial, Idrovo did not testify about the composition of the table but testified that Cintron pulled the gun from his waistband while standing several feet away from him, rather than sitting across from him at the table.[8]  N.T. 6/21/2011 at 76.  However, the Commonwealth introduced a photograph, Commonwealth Exhibit 20, that showed a wooden table in Cintron's apartment – rather than a glass table.  N.T. 6/21/2011 at 156; PCRA Notice at 7.  A police officer who responded to the shooting, Officer Harper, also testified that the kitchen table in Cintron's apartment was "white."  N.T. 6/21/2011 at 155.

In the amended PCRA petition filed in June 2017, Attorney Norcini argued that Attorney Book was constitutionally ineffective in failing to impeach Idrovo with his preliminary hearing testimony, "which directly contradicted his trial testimony concerning the composition of the table in Petitioner's residence," and that Cintron was entitled to an evidentiary hearing to remedy this failure.  Am. PCRA Pet., 6/27/2017 at 4.

Judge Mahon found that this claim did not constitute ineffective assistance under *Strickland*, as the preliminary hearing testimony was not truly inconsistent with Idrovo's trial testimony:

> In the present case, there was nothing in Mr. Idrovo's preliminary hearing
> testimony that was so inconsistent with his trial testimony, as to compel a
> conclusion that Defendant was denied the use of vital impeachment evidence at
> trial.  The record is unclear whether the victim testified at trial differently than at
> the preliminary hearing.  At the preliminary hearing the victim testified concerning

---

[8] Cintron does not argue that Attorney Book provided ineffective assistance for failing to cross-examine Idrovo with the inconsistency in his testimony about whether Cintron was standing up or sitting across from him, but focuses his argument solely on the table composition issue.  *See* N.T. 6/21/2011 at 121-23 (cross-examination of Idrovo with preliminary hearing testimony).

the composition of the "dining room" table, (*see* N.T. 5/7/10 at 17-19), but at trial he never testified concerning the composition of the table. Along similar lines, Mr. Idrovo was question specifically about the "dining room" table at the preliminary hearing, but at trial, the table was described as a "kitchen" table. Therefore, the record is unclear as to whether there was more than one table in the residence.

Mr. Idrovo did not contradict his preliminary hearing testimony at trial, thereby warranting impeachment. In fact, he testified consistently at both proceedings by stating the Defendant pulled the gun from his waistband. Consequently, trial counsel was not ineffective for failing to impeach the victim at trial with his preliminary hearing testimony with respect to the physical composition of the table, when the testimony from the two proceedings was not inconsistent.

PCRA Notice at 8.

Judge Mahon further found that "even if trial counsel had been able to impeach the victim," this would not have changed the outcome of the trial "given the overwhelming evidence" of Cintron's guilt, and therefore any actual prejudice from Attorney Book's failure to impeach Idrovo on this issue was minimal:

Here, much of Defendant's trial testimony corroborated Mr. Idrovo's version of the events and the Commonwealth's theory of the case. Specifically, Defendant admitted to shooting Mr. Idrovo and did not dispute the fact that Mr. Idrovo sat at his table while he held him at gun point. No factual dispute exists as to whether Defendant was armed with the gun when he invited Mr. Idrovo into his residence. Defendant merely disputed that he was the aggressor by claiming he shot Mr. Idrovo in self-defense. N.T., 6/23/11, at 69-78, 102. Therefore, the composition of the table had no bearing on the ultimate issue in the case. Although Defendant argues that trial counsel could have used the alleged minor discrepancy concerning the composition of the table to discredit Mr. Idrovo's testimony, this would not have changed the outcome of the trial. Having presided over the three day trial and reviewed the record multiple times, the Court finds it highly unlikely that the jury would have accepted Defendant's self-defense argument even if the victim was impeached regarding the composition of the top of the table.

PCRA Notice at 7-8.

Judge Mahon also found that Attorney Book was not ineffective for failing to question Idrovo about Officer Harper's testimony about the "white" table. Beyond Pennsylvania evidence

rules that would prevent Book from impeaching Idrovo using another witness' testimony, Judge

Mahon found that Harper's testimony was not inconsistent with Idrovo's testimony:

> Officer Harper's testimony established at a minimum that there was a "counter" and a "small table" in the dining room/kitchen area.  However, the record is unclear as to the total number of tables in that area.  It is plausible that there were additional tables in that area of the residence.  Furthermore, Officer Harper did not identify the composition of either the "counter" or "small table."  Officer Harper's belief that the "small table" was "white, on the right hand side" does not mean that it could not have also had a glass top.  Similarly, the officer's testimony does not dispositively establish that the top of the table was made of wood or other solid material.  It is reasonable to conclude that the "small table" could have been white on the sides, with a glass top.  Because Officer Harper did not testify about the composition of the top of the table, trial counsel was not ineffective for failing to impeach Mr. Idrovo with Officer Harper's trial testimony.
>
> We acknowledge that trial counsel could have attempted to discredit the testimony through cross-examination at trial.  Trial counsel could have questioned Mr. Idrovo about Officer Harper's belief that the table was white.  However, this omission would not have changed the outcome of trial . . . Here, given the overwhelming evidence of Defendant's guilt in this case, including his statements to police and flight to avoid apprehension, we do not find that trial counsel's failure to question the victim regarding Officer Harper's testimony satisfies the prejudice prong.

PCRA Notice at 10.

Finally, Judge Mahon found that Attorney Book was not ineffective for failing to question

Idrovo about the wooden table depicted in Commonwealth Exhibit 20:

> Defendant's argument is predicated upon the faulty assumption that Commonwealth Exhibit 20 depicts the same table that Officer Harper referred to as the "kitchen table" at trial.  Defendant further presumes that the exhibit depicts the same table that Mr. Idrovo described as having a glass top at the preliminary hearing.  Trial counsel cannot be ineffective for failing to impeach on a speculative claim.  It is clear from the record that Commonwealth Exhibit 20 was never identified as the same table that Mr. Idrovo testified about at the preliminary hearing.  It is equally plausible that Commonwealth Exhibit 20 depicts the "counter" and not the table referenced by Mr. Idrovo at the preliminary hearing.  Mr. Idrovo never testified about the composition of the "counter."  Therefore, it is unclear whether the "kitchen table" identified by Officer Moore is the same table that Mr. Idrovo sat at when he entered Defendant's residence.  Because Defendant is unable to prove that Commonwealth Exhibit 20 depicts the same table that Mr. Idrovo sat at inside Defendant's residence and testified about at the preliminary hearing, we write no further on the issue.

PCRA Notice at 12.

On appeal, the Superior Court affirmed, holding that the "PCRA court's opinion comprehensively discusses and properly disposes of the question presented." *Commonwealth v. Cintron*, No. 552 EDA 2018, 2018 WL 6190381, at *3 (Pa. Super. Ct. Nov. 28, 2018).

The state courts' analysis of this issue is consistent with *Strickland* and did not result in an unreasonable determination of the facts. After my own review of the record, I agree that Idrovo's testimony at trial was not inconsistent with his testimony at the preliminary hearing regarding the table. Idrovo did testify at the preliminary hearing that the table in the apartment was glass-topped. N.T. 5/7/2010 at 18-19. But he never said anything about the composition of the table during his trial testimony. *See* N.T. 6/21/2011 at 72-73, 75-77. Trial counsel therefore had little basis to impeach or cross-examine Idrovo regarding the table's composition, using the preliminary hearing transcript, Officer Harper's testimony, or Commonwealth Exhibit 20. And by any measure, the issue was peripheral. Idrovo was not shot at the table, but outside after he fled the residence. Even if Book did have grounds to impeach Idrovo on the table's composition, the PCRA court's determination that impeachment on such a minor detail would not change the ultimate outcome is not contrary to or an unreasonable application of the *Strickland* prejudice analysis, nor does it rest upon an unreasonable determination of the facts. I will therefore not disturb the state courts' determination of this claim.

### c. Grounds Two, Three, and Four are procedurally defaulted, and Cintron cannot overcome default under *Martinez.*

Cintron's claims in Grounds Two, Three, and Four are procedurally defaulted. There is no dispute that the claims were not fully presented to the state court, as PCRA counsel refused to pursue the claims asserted in Grounds Two and Three, and Cintron did not raise Ground Four in

his PCRA petition.  Any attempt by Cintron to present the claims now would be futile due to the one-year statute of limitations in the Pennsylvania PCRA statute.  *See* 42 Pa. C.S. § 9545(b)(1).[9]

Cintron cannot escape this default under *Martinez*.  As noted above, a petitioner seeking to overcome procedural default under *Martinez* must show that (1) the defaulted claim of ineffective assistance at trial is "substantial" and (2) post-conviction counsel's performance fell below an objective standard of reasonableness.  *See Workman*, 915 F.3d. at 941. In reviewing whether counsel acted reasonably, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. 668 at 689 (1984).  Here, even if Cintron's claims had some merit – and I am hard pressed to find that they do – I cannot find that Attorney Norcini's actions were so deficient as to defeat the presumption that he provided reasonable assistance to Cintron during the post-conviction proceedings.

### 1. *Cintron cannot overcome his procedural default on Ground Two.*

In the claim that is now Ground Two, Cintron argues trial counsel was ineffective in failing to call a witness, Dr. Hector Diaz, who would have testified that Idrovo told him that the shooting was the result of a rent dispute.  Pet. at 10, 10(a)-1, ECF No. 1 at 26, 27.  Attorney Norcini reviewed the proceedings and concluded that he could not deem the absence of Dr. Diaz's testimony prejudicial to Cintron.  Pet. Mem. Ex. F at 4-5, ECF 4 at 147-48.

At trial, Attorney Book cross-examined Idrovo about the conversation he had with Dr. Diaz, a psychiatrist who treated Idrovo while he was hospitalized after the shooting:

---

[9] Cintron's judgment of sentence became final on December 4, 2013.  The Pennsylvania PCRA's statute of limitations expired one year later, on December 4, 2014.  *See* 42 Pa. C.S. § 9545(b)(1) ("Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final").  The PCRA statute lists three limited exceptions to this filing deadline, none of which apply to Cintron's circumstances.  *See id.*  Accordingly, Cintron is barred from seeking relief in state court, and the claims are procedurally defaulted.  *See Smith v. Luther*, 2018 WL 3581140, at *3 (E.D. Pa. 2018) (citing *Keller v. Larkins*, 251 F.3d 408, 415 (3d Cir. 2001)).

Q:    All right.  Do you recall during your treatment at the hospital meeting with
      some different kinds of doctors to help you out?

A:    Yes, the first time I had to have a lot of doctors.

Q:    Sure.  Do you remember meeting with, like, a psychologist-type doctor?

A:    Yes.

Q:    And he wanted to ask you questions about your state of mind and how you
      were doing?

A:    Yes.

Q:    Do you remember meeting with him on April 16th of 2010?

A:    Yes.

Q:    Do you remember his name being Dr. Diaz, Hector Diaz?

A:    I remember that it was a Hispanic doctor that went.

Q:    And so he asked you questions in Spanish and you replied in Spanish?

A:    Yes.

Q:    Do you recall telling the doctor when he asked you about the gunshot, that
      this was all about rent and a tenant who didn't want to pay rent?

A:    Yes.

N.T. 6/21/2011 at 118-19.  Attorney Book then attempted to refer to Dr. Diaz's notes in continuing

the cross-examination, to which Judge Mahon sustained an objection.  *Id.* at 119-20.  Upon further

questioning about his conversation with Dr. Diaz, Idrovo backpedaled and seemingly denied

having told Dr. Diaz that the shooting was about rent.  *Id.* at 120.  Because Judge Mahon had

prevented defense counsel from referring to the doctor's notes, Cintron argues that Dr. Diaz should

have been called as a defense witness.[10]

"A failure to call a witness is not *per se* ineffective assistance of counsel for such decision

usually involves matters of trial strategy."  *Commonwealth v. Sneed*, 45 A.3d 1096, 1108-09 (Pa.

2012).  That is necessarily so as counsel must have "wide latitude . . . in making tactical decisions."

---

[10] Cintron argues that he was prejudiced by "trial counsel's failure to comply with the established legal
procedures and subpoena and/or call Dr. Dias [sic] to the stand to testify."  Pet.'s Mem., ECF 4 at 55.

*Strickland*, 466 U.S. at 689.  Here, defense counsel had extracted a concession from Idrovo that he told Dr. Diaz the dispute was "all about rent," rather than a murder-for-hire scheme. The witness later sought to deny making that statement, but counsel had secured the concession she sought, and as noted below highlighted that point in closing argument. It is not the place of this Court to second-guess her decision not to call Diaz on top of extracting the concession.

Regardless, any errors made on this issue did not prejudice the ultimate outcome of the trial.  Attorney Book successfully elicited testimony from Idrovo that the shooting involved a rent dispute and then highlighted Idrovo's inconsistent testimony during her closing argument:

> How about when Mr. Idrovo was contradicted with what he told the doctor when he came to see him.  Do you remember speaking to Dr. Hector Diaz of Lancaster General?  He appears to remember what we were talking about and agreed that he told the doctor a version of the story, a version of that story that involved around rent, but when he started to get into that, he realized this was going somewhere else. He immediately forgot the conversation.

N.T. 6/23/2011 at 8.  Given that trial counsel was able to emphasize the inconsistency between Idrovo's trial testimony and what he told Dr. Diaz immediately after the shooting, I cannot say under *Strickland* that there is a reasonable probability that the result of the proceeding would have been different if Dr. Diaz had testified to buttress this one point.

Attorney Norcini summarized why in his view the failure to call Dr. Diaz was not prejudicial in his "no merit" letter sent on September 6, 2017, by placing this proposed testimony in the context of all the other evidence introduced at trial:

> Since the evidence you sought to elicit from Dr. Diaz was introduced anyway, I cannot find the absence of his testimony was so prejudicial as to have denied you a right to a fair trial.  *Commonwealth v. Dennis*, 17 A.3d 297, 302 (Pa. 2011).
>
> Even so, a look at the case outside the vacuum of this one issue shows there was substantial evidence the incident was not a dispute over rent . . . Idrovo testified you stated to him you were going to kill him because you were hired by his ex-wife.  You gave a statement to police in which you tell them you were there to kill him and wanted him to die.  Even if you could establish the first two elements

required to show ineffectiveness, you cannot establish the absence of his testimony was so prejudicial that it denied you the right to a fair trial.

Finally, even if this was a dispute over rent, the evidence still supported a conviction for attempted murder.  First, the evidence showed you shot Idrovo in the stomach.  Second, the jury did not believe your testimony, as is evidenced by the verdict.  Third, your statement to police that you wanted Idrovo to die all provided sufficient evidence to find you guilty of attempted murder.  As such, I cannot say that "the nature and quality of the [testimony of Dr. Diaz] is such that there is a reasonable probably that the jury would have credited it and rendered a more favorable verdict."  *Commonwealth v. Johnson*, 966, A.3d 523, 542 (Pa. 2009).

Norcini Letter, Pet.'s Mem. Ex. F at 5, ECF 4 at 148.  Based on my own review of the testimony at trial, I find that Cintron does not establish a "substantial" claim of ineffective assistance on this issue.

Even if Cintron's claim is substantial, however, Norcini's choice not to raise the claim with the PCRA court does not constitute ineffective assistance.[11]  "There is a 'strong presumption' that an attorney's decision to pursue some claims and decline to pursue others is a tactical choice." *Workman*, 915 F.3d at 942.  As quoted above, Norcini reviewed the evidence in the case and found that trial counsel introduced the relevant evidence through the victim; that there was substantial evidence that the shooting was not a dispute over rent; and that, even if it could be proved there *was* a dispute over rent, the evidence still strongly supported Mr. Cintron's conviction.  Norcini

---

[11] Norcini's initial filing of the amended PCRA petition, which failed to include a "no merit" letter addressing all arguments raised by Cintron in his original petition, might have constituted deficient performance, allowing Cintron to overcome procedural default in this Court. *See Commonwealth v. Kelsey*, 206 A.3d 1135, 1139 (Pa. Super. Ct. 2019) ("Where PCRA counsel's no-merit letter does not discuss all of the issues that the convicted defendant has raised in a first PCRA petition and explain why they lack merit, it does not satisfy [the] mandatory requirements [for a "no merit" letter] and dismissal of the PCRA petition without requiring counsel to file an amended PCRA petition or a further, adequate no-merit letter *is a* deprivation of the right to counsel on the PCRA petition.").  Judge Mahon remedied this deficit by ordering Norcini to review each claim and file either an amended petition containing these claims or a no merit letter. Because Norcini then filed the required "no merit" letter, I cannot find his performance deficient on this basis.

Letter, Pet. Mem. Ex. F, ECF 4 at 148.  Mr. Norcini therefore had a reasonable basis on which to conclude the issue was without merit, and I will not question his tactical choice.  *Id.* at 5.

Because Cintron cannot establish objectively unreasonable performance by his post-conviction counsel in failing to raise this claim, he cannot overcome procedural default as to Ground Two.

### 2.   *Cintron cannot overcome his procedural default on Ground Three.*

Mr. Cintron's next claim contends that Attorney Book was ineffective at trial by failing to object and move to strike remarks during the prosecutor's opening statement and closing argument representing that Cintron verbally expressed an intent to kill Idrovo.  Mr. Cintron appears to base this argument on the fact that Idrovo denied hearing Cintron make such a statement immediately before he pulled the trigger. Pet. at 12, 12(a)-1, ECF 1 at 37, 38.

During her opening statement, the prosecutor told the jury that after Cintron asked Idrovo into his apartment, Cintron "pulls out a gun, he points it at him, he tells him he is going to kill Francisco.  And he tells him, *I'm going to kill you because his ex-wife's boyfriend paid me to do it.*"  N.T. 6/21/2011 at 22 (emphasis added).  A few moments later, the prosecutor stated that after Idrovo fled the apartment and ran towards the road, "[t]he defendant right behind him, catches up to him as they're rounding the pool area, stops him, points the gun at him, *again tells him he is going to kill him,* pulls the trigger, shoots him in the stomach . . . ."  *Id.* (emphasis added).  As set forth below, the prosecutor was only partially correct:   when the victim testified, he recounted only one such threat, not two.

During her closing argument, the prosecutor was more precise, and referred to only one instance of Cintron making such a threat against the victim:

> I suggest to you that when [Idrovo] says this man pointed the gun at him, told him he was going to kill him, that is a specific intent to kill, conscious intent, using a deadly weapon on a vital part of the body. […]
>
> Considering the circumstances surrounding it, the words and the conduct and other circumstances that surrounded the scene of that particular date, the defendant's words he said: I'm going to kill you.  He shot the gun.  He told the police afterwards.  Why would he say that?  Why would he tell the police I wanted to kill him?  Do you think they made that up? […]
>
> He used the deadly weapon instead of his fists.  He said he was going to kill him and he chased him when he tried to run away.

N.T. 6/23/2011 at 36-38.

Attorney Norcini, after reviewing the record, found evidence that Cintron *did* state an intent to kill Idrovo before shooting him,  and later admitted he had such an intent to the police, and therefore found no fault in trial counsel's failure to object.  *Id.* at 6.  Based on my own review of the record, I cannot find that Attorney Book's performance was deficient in failing to object and strike these statements by the prosecutor.

Cintron is correct that on direct examination by the prosecutor, Idrovo denied that Cintron said anything to him *immediately* before Cintron fired the gun.  N.T. 6/21/2011 at 82. But he clearly testified to Cintron expressing an intent to kill him:

> A:     [Cintron] told me he was going to make me listen to a message that a boyfriend – my wife said that he was going to pay him $5,000 to kill me, and he is going to kill me because that's his job. […]
>
> Q:     Where – did the defendant say anything to you before he shot you?
> A:     Yes, that they had given him $5,000, that's how much they paid him for – to kill me.
>
> Q:     Now that was back up in the apartment, right?
> A:     Yes. […]
>
> Q:     What did the defendant tell you as to why he was going to kill you?
> A:     He told me that he had – they had paid him to kill me, but he didn't tell me why.

> Q:     And did he say who is they?
> A:     The boyfriend of my ex-wife had – he had him to kill me.

N.T. 6/21/2011 at 73-81.  In response to the prosecutor's question about whether Cintron said anything to Idrovo just before shooting him, Idrovo testified, "No, just what he said to me back at the apartment" – i.e., the statements about intent he had just testified about moments before.  *See* N.T. 6/21/2011 at 82.  In short, the victim remained consistent in his testimony that a specific threat was made.  In addition to Idrovo's statement, a detective who interrogated Cintron also testified at trial that Cintron told him, "I wanted to kill him, I wanted him to die."  N.T. 6/22/2011 at 174.

Under Pennsylvania law, "[p]rosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable."  *Commonwealth v. Chmiel*, 30 A.3d 1111, 1146 (Pa. 2011).  Failure to assert a meritless objection cannot be grounds for a finding of deficient performance.  *United States v. Islam*, 932 F.3d 957, 964 (D.C. Cir. 2019); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997).  As to the prosecutor's closing argument, because there was evidence at trial to support the prosecutor's statements about Cintron communicating his intent to Idrovo, there was no basis upon which trial counsel could have properly objected.

As to the prosecutor's opening statement, Cintron is correct that counsel overstated the case.  Specifically, the prosecutor's statement in her opening that Cintron pointed the gun at Idrovo, "again tells him he is going to kill him, pulls the trigger," N.T. 6/21/2011 at 22, was not ultimately supported by evidence at trial.  But there was certainly evidence that a threat was made, even though the victim made clear that the threat was only made once, a few  minutes before Cintron shot him.

"The prosecution, as well as the defense, is afforded reasonable latitude in presenting opening arguments to the jury," *Commonwealth v. Parker*, 919 A.2d 943, 950 (Pa. 2007). The

prosecutor's description proved to be imprecise, but it was not fabricated out of whole cloth, and cannot be considered as an assertion "designed to inflame the jury's emotions."  *Id.*  There is nothing in the record to support an inference that the prosecutor knew or should have known that her statement was incorrect and sought to mislead the jury. Nor does the record show that defense counsel had detailed enough knowledge about what Idrovo would say to object with confidence at the outset of the case.  Once Idrovo testified,  defense counsel could have requested the judge to strike that portion of the prosecutor's  opening, but such a motion would have a hollow ring  in the face of the victim's testimony that such a threat had in fact  made, albeit a few minutes earlier. And the remedy – some instruction by the court  - would carry the distinct disadvantage of focusing the jury on  other testimony about Cintron making such a threat. This represents precisely the kind of tactical   judgment by trial counsel that federal habeas courts should  not second guess, particularly where the jury is instructed that the statements of counsel are not evidence.  I therefore do not see failure to object to the prosecutor's opening statement as grounds to assert a substantial claim of ineffective assistance.

Even if Cintron could establish a substantial claim that trial counsel was ineffective here, he cannot overcome procedural default on this claim because Attorney Norcini's performance das post-conviction counsel did not fall below an objective standard of reasonableness.  As with Ground Two, Norcini conducted a thorough analysis of why this claim was meritless in his letter to Cintron that was filed with the PCRA court, correctly observing that Idrovo did in fact testify that Petitioner stated his intent to kill the complainant, and that Detective Martin recounted Cintron's statement of his intent to kill Idrovo, as well.  Norcini Letter, Pet.'s Mem. Ex. F at 5-7, ECF 4 at 148-49.  Norcini also noted that any prejudice was minimized by the trial court's jury charge, which reminded the jury that counsel's statements during openings and closings do not

constitute evidence.  *Id*. at 6-7, ECF 4 at 149-50.  Norcini reasonably concluded that the claims were weak, and I cannot fault his exercise of professional discretion in choosing not to advance this claim to the PCRA court.  *Id.* at 5.

### 3.   *Cintron cannot overcome his procedural default on Ground Four.*

Cintron's final claim argues that the cumulative prejudice from the errors of trial counsel, as described in Grounds One, Two, and Three, deprived Cintron of his right to the effective assistance of counsel under *Strickland* and a fundamentally fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.  Pet. at 13, 13(a)-1, ECF 1 at 43-44. Although this ground was not presented to the state courts and was not precisely considered and rejected by Attorney Norcini, it is premised entirely on the arguments contained in Grounds One, Two, and Three, which Norcini thoughtfully reviewed and considered.

In the Third Circuit, federal habeas courts may cumulatively assess an attorney's errors to determine whether the attorney's errors prejudiced a defendant under *Strickland*:

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (cleaned up).  A claim of cumulative prejudice "aggregates all the errors that individually have been found to be harmless," and assesses "whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."  *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003)); *see also Albrecht v. Horn*, 485 F.3d 103, 139 (3d

Cir. 2007) ("We recognize that errors that individually do not warrant habeas relief may do so when combined").

Cintron's claim of cumulative prejudice arises from the three ineffective assistance claims asserted in Grounds One, Two, and Three. *See* Pet.'s Mem., ECF 4 at 82-83. However, as I explained above, I do not find that trial counsel's performance was defective for any of the three claims. For Ground One, defense counsel had very little basis to impeach or cross-examine Idrovo regarding the table's composition, which was, in any case, a peripheral issue. For Ground Two, given that Idrovo had already testified to what he told Dr. Diaz, albeit with some equivocation, I cannot fault counsel for not calling Dr. Diaz to reinforce the point. And for Ground Three, counsel had no basis to object to the prosecutor's statements about Cintron's intent during the prosecutor's closing argument. As to the prosecutor's opening statement, it is not clear that there was a sufficient basis to object in the moment, and there was no risk-free path to revisit the misstatement at the close of the evidence. Because I have already concluded that the actions by trial counsel identified in Cintron's petition were not error, these actions in combination cannot be used to support a claim of cumulative ineffective assistance.

Separately, Mr. Cintron cannot overcome procedural default on this claim because I cannot find that Attorney Norcini acted unreasonably in failing to advance cumulative prejudice as a PCRA claim. A claim of cumulative prejudice is a valid means of assessing ineffective assistance under Pennsylvania law. *See Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009) (holding that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation"); *Commonwealth v. Perry,* 644 A.2d 705, 709 (Pa. 1994) (holding that several instances of ineffectiveness, "in combination," prejudiced defendant). Here, Norcini determined that counsel's actions identified in Grounds Two and Three did not constitute

28

deficient performance after his thorough review of the record.  He therefore acted reasonably by not raising a claim of cumulative prejudice incorporating these claims, and Mr. Cintron cannot overcome his procedural default on Ground Four.

## IV.    Conclusion

For the reasons set forth above, I am constrained to deny Cintron's Petition, and find no basis for issuing a certificate of appealability.  An appropriate order follows.

  s/ Gerald Austin McHugh\_
United States District Judge
